IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GERARD OUSLEY,                    )
                                  )
                Plaintiff,        )
                                  )
        v.                        )          1:12CV31
                                  )
ROBERT A. McDONALD, Secretary     )
of the Department of              )
Veterans Affairs,[1]              )
                                  )
                Defendant.        )


**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Plaintiff Gerard Ousley ("Plaintiff) commenced this action

against Defendant Robert A. McDonald, in his official capacity

as Secretary of the Department of Veterans Affairs ("Defendant"

or "VA"), alleging race-based discrimination in violation of

Title VII of the Civil Rights Act of 1964, as amended and

codified at 42 U.S.C. 2000e, et seq. ("Title VII").

Specifically, Plaintiff claims that he was removed from his

position based on his race.

This matter is now before this court on Defendant's Renewed

Motion for Summary Judgment.  (Doc. 18.)  Plaintiff has

---

[1] Robert A. McDonald was sworn in as Secretary of Veterans
Affairs on July 30, 2014.  Pursuant to Rule 25(d) of the Federal
Rules of Civil Procedure, Robert A. McDonald should therefore be
automatically substituted for Eric K. Shinseki as the Defendant
in this suit.  See Fed. R. Civ. P. 25(d).

responded in opposition to Defendant's Renewed Motion for Summary Judgment (Doc. 25), and Defendant has submitted a reply (Doc. 27). The matter is now ripe for adjudication.[2]

For the reasons that follow, this court will grant Defendant's Renewed Motion for Summary Judgment, and this action will be dismissed.

---

[2] Defendant made its Initial Motion for Summary Judgment soon after filing its Answer to Plaintiff's Complaint and before the parties had conducted discovery. (Doc. 7.) Accompanying its motion, Defendant filed a Memorandum in Support (Doc. 8) and included a number of exhibits. (Def.'s Exs. (Docs. 8-2 to 8-47).) Plaintiff responded to Defendant's Initial Motion for Summary Judgment, requesting relief pursuant to Rule 56(d) and stating that Plaintiff needed discovery to respond to Defendant's Initial Motion for Summary Judgment. (See Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. (Doc. 12); Aff. of James E. Hairston, Jr., Pursuant to Rule 56(d) (Doc. 12-1).) This court construed Plaintiff's response as a Rule 56(d) motion for discovery and granted Plaintiff's motion in part to allow Plaintiff to depose Nina Graves and, at the same time, denied Defendant's Initial Motion for Summary Judgment without prejudice. (Order (Doc. 15) at 1, 10-11.) After discovery, Defendant subsequently filed a Renewed Motion for Summary Judgment (Doc. 18) that adopts by reference many of the arguments made and exhibits included in support of Defendant's Initial Motion for Summary Judgment. (Def.'s Mem. in Supp. of Renewed Mot. for Summ. J. ("Def.'s Renewed Summ. J. Mem.") (Doc. 19) at 1-2.) Therefore, this court will refer to the Memoranda submitted by Defendant with both its Initial and its Renewed Motions for Summary Judgment. (See Docs. 8 and 19.)

## I.  **FACTS**

Plaintiff is an African-American veteran, who has served in law enforcement for approximately thirty-seven years and is a graduate of the United States Military Academy at West Point. (Pl.'s Mem. in Opp'n to Def.'s Renewed Mot. for Summ. J. ("Pl.'s Second Resp.") (Doc. 25) at 1.)

In April 2006, Plaintiff became Police Chief of the VA Medical Center in Durham, North Carolina ("Durham VAMC").  (Id.) The police chief of each VAMC is hired by the director of that VAMC.  (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Initial Summ. J. Mem.") (Doc. 8) at 2.)  On two occasions, Plaintiff's job performance was rated as "successful" and "excellent," respectively.  (Pl.'s Second Resp. (Doc. 25) at 2.) However, on April 24, 2009, Ralph T. Gigliotti, the director of Durham VAMC, suspended Plaintiff for one day, removed Plaintiff from his position as Police Chief, and reassigned Plaintiff as a Supervisory Medical Support Assistant, effective May 24, 2009. (Def.'s Initial Summ. J. Mem. (Doc. 8) at 7-8.)

The events that led to Plaintiff's removal as Police Chief are not in dispute, although Plaintiff does seek to add some additional context to Defendant's recitation of the facts.  (See Pl.'s Second Resp. (Doc. 25) at 1 n.1.)

The first event that led to Plaintiff's suspension and ultimately to his removal was Plaintiff's response to an incident where one of Plaintiff's officers was found to have used excessive force against a patient (the "use-of-force incident"). (See Complaint ("Compl.") (Doc. 1) ¶¶ 13-29; Pl.'s Second Resp. (Doc. 25) at 1-3.) On October 28, 2008, two VA police officers responded to a disturbance call involving a patient in the outpatient area of Durham VAMC. The officers escorted the patient, who had required physical restraint in the past, to a nearby room. As the patient entered the room, witnesses reported that the patient struck one of the officers. That officer warned the patient to get down, and when the patient did not comply, the officer struck the patient three or four times with a baton, breaking the patient's wrist. (Pl.'s Second Resp. (Doc. 25) at 2.)

As the Durham VAMC Police Chief, Plaintiff conducted an investigation of the event by interviewing the officers involved, obtaining witness statements, speaking with medical personnel about the patient's pain tolerance and ability to understand verbal instructions, and reviewing the videotape of the incident. Plaintiff determined that the videotape -- which only captured part of the incident -- was not determinative, and Plaintiff found that the officer had not used excessive force in

restraining the patient. (Id.) Plaintiff notes that he is
somewhat of a subject matter expert on use of force, as he was
an instructor on appropriate use-of-force procedures for law
enforcement officers at the VA Law Enforcement Training Center
(LETC) in Little Rock, Arkansas, before accepting the position
of Police Chief at Durham VAMC. (Id. at 1.)

By early November 2008, Director Gigliotti had received
complaints about the use-of-force incident, including an
anonymous letter demanding an investigation and threatening
media exposure. (Def.'s Initial Summ. J. Mem. (Doc. 8) at 3-4.)
Per VA regulations, Director Gigliotti convened a four-person
Administrative Board of Investigation ("ABI") to review the
incident. The ABI interviewed ten individuals, including the
officers involved, medical personnel, and Plaintiff. (See id.,
Ex. 6, ABI Report (Doc. 8-7) at 1-6.) The ABI drafted a report
of its findings, and in that report, the ABI disagreed with
Plaintiff, found that the officer used excessive force, and
suggested that Plaintiff's determination "reflected poor
judgment." (See id. at 7.) Plaintiff continues to disagree
with this assessment. (Pl.'s Second Resp. (Doc. 25) at 4.)

An officer at the LETC, Thomas W. Kellogg, then reviewed
the incident and also concluded that the officer used excessive
force. (Def.'s Initial Summ. J. Mem. (Doc. 8) at 4; Ex. 13,

Kellogg's Report (Doc. 8-14) ¶¶ 2, 13.)  Plaintiff does not contest this fact but argues that Kellogg only reviewed the video, which was not reflective of the entire incident. However, Plaintiff admits that, even when Kellogg received information that the officer had been struck before using force, Kellogg rendered a second report where he maintained his position that the officer used excessive force.  (Pl.'s Second Resp. (Doc. 25) at 5; Ex. E, Kellogg Dep. (Doc. 25-6) at 6.)

In March 2009, Plaintiff received written notice proposing a suspension for five (5) days for failure to discipline an officer for failing to follow proper procedures.  Plaintiff appealed that proposed suspension and it was reduced to a one-day suspension.  (Def.'s Initial Summ. J. Mem. (Doc. 8) at 7; Ex. 30, Director Gigliotti's Decision on Proposed Suspension (Doc. 8-34) at 1.)

The second event that led to Plaintiff's removal was the Durham VAMC police department's performance on a Biannual Review conducted by the VA's Office of Security and Law Enforcement ("OSLE").  (See Compl. (Doc. 1) ¶ 31.)  The purpose of the biannual OSLE inspection was to "evaluate the Medical Center's continued Implementation of VA's security and law enforcement regulations and related VHA policies and procedures."  (Def.'s Initial Summ. J. Mem., Ex. 25, OSLE Inspection Report (Doc.

8-26) at 1.)  Plaintiff's first OSLE inspection as Police Chief
occurred in November 2006, and the department was rated
satisfactory.  (Id.)

The OSLE inspection that led to Plaintiff's removal
occurred in February 2009, and it was conducted by a five-person
team (the "OSLE Inspection Team").  The OSLE Inspection Team was
led by Dr. Nina Graves, who is African American, (Def.'s Initial
Summ. J. Mem. (Doc. 8) at 6), and during the inspection, the
team observed police operations, reviewed police program
paperwork, and conducted staff interviews. (OSLE Inspection
Report (Doc. 8-26) at 11.)  After conducting its investigation,
the OSLE Inspection Team found six areas of deficiencies,
including (1) personnel and training; (2) administration; (3)
operations; (4) equipment, weapons, and weapons control; (5)
physical security; and (6) outcomes/customer satisfaction.
(Def.'s Initial Summ. J. Mem. (Doc. 8) at 6.)

The report issued by the OSLE Inspection Team indicated a
"laissez faire" attitude by Plaintiff and his officers that
resulted in numerous problems within the police force,
culminating ultimately in the police service not being able to
provide a safe and secure environment for VA patients, visitors,
and personnel.  (OSLE Inspection Report (Doc. 8-26) at 11.)  Dr.
Graves informed Director Gigliotti that the deficiencies found

-7-

were so egregious that the OSLE Inspection Team recommended immediate re-assignment of both the Police Chief and the Assistant Police Chief. (Def.'s Initial Summ. J. Mem. (Doc. 8) at 6.) The Assistant Police Chief, who is also African American, was not removed because he was new in his role. (Id. at 6 n.2.)

Plaintiff claims that there were irregularities in the OSLE inspection and his subsequent removal. First, Plaintiff claims that the OSLE inspection was a "surprise" inspection. (Compl. (Doc. 1) ¶ 31.) Both parties agree that the inspection was scheduled for March 2009 but that Director Gigliotti had the inspection take place a month early in February 2009. Plaintiff explains that the "reason the Director sought the review of the service is because Plaintiff maintained that both the conclusion of the ABI and the opinion from Kellogg in Little Rock were wrong." (Pl.'s Second Resp. (Doc. 25) at 6.) Defendant does not disagree but explains that the inspection was also necessitated by reports from other departments at Durham VAMC that they were losing confidence in the Durham VAMC police department. (Def.'s Initial Summ. J. Mem. (Doc. 8) at 5.) Defendant also states that Plaintiff knew that the biannual review was due in November 2008 or the first quarter of 2009, such that although the inspection was unannounced, it was not a

surprise inspection.  In addition to the timing of the
inspection, Plaintiff also claims that it is irregular for the
OSLE Inspection Team to recommend the removal of a Police Chief
in an inspection report.  (Pl.'s Second Resp. (Doc. 25) at 6.)

Although the parties are in general agreement on the events
that led to Plaintiff's removal, the parties disagree on the
role William Dale Hendley played in the ultimate decision to
remove Plaintiff from his role as Police Chief.  Plaintiff's
case revolves around Hendley being the actual decisionmaker in
removing Plaintiff from his position.  (See, e.g., Compl. (Doc.
1) ¶¶ 29, 31, 42-45.)  Hendley is Police Chief at the VAMC in
Salem, Virginia, and the Lead Police Chief for the Veterans
Integrated Service Network 6, the division of the VA serving
North Carolina, Virginia, and West Virginia.  (Def.'s Initial
Summ. J. Mem. (Doc. 8) at 2.)  As the Lead Police Chief, Hendley
was tasked as being a resource, mentor, and advisor to the
Police Chiefs at the seven other VAMCs in the division.  (Id. at
1-2.)  The parties agree that Hendley, as Lead Police Chief, was
not Plaintiff's supervisor.  However, Plaintiff does note that
Hendley had some authority over Plaintiff, was involved in the
process of evaluating Plaintiff's performance, and had some

ability to "put [Plaintiff] under a microscope." (See Pl.'s

Second Resp., Ex. G, Graves Dep. (Doc. 25-8) at 11.)[3]

Additionally, Plaintiff argues that Hendley took specific

actions that influenced the ultimate decision to remove

Plaintiff. Both parties agree that, after reviewing the

videotape, Hendley believed that the officer under Plaintiff's

supervision had used excessive force, and Hendley urged

Plaintiff to discipline the officers. (Compl. (Doc. 1) ¶ 35.)

According to Plaintiff, Hendley consulted with Director

Gigliotti and the ABI about the incident. The parties do not

dispute, and Director Gigliotti admits, that he communicated

with Hendley "extensively," after the ABI conducted its

investigation and submitted its report. (Pl.'s Second Resp.,

Ex. A, Gigliotti Dep. (Doc. 25-2) at 11.) However, to the

extent Plaintiff claims Hendley convinced Director Gigliotti

that Plaintiff should be removed as Police Chief, he has not

offered proof of these communications.

Plaintiff also contends that Hendley exerted significant

influence over the ABI investigation. Plaintiff asserts that

Hendley told Plaintiff "that [Hendley] convened the ABI," (Pl.'s

---

[3] All citations in this Order to documents filed with the
court refer to the page numbers located at the bottom right-hand
corner of the documents as they appear on CM/ECF.

Second Resp. (Doc. 25) at 3), but Plaintiff does not offer any evidence, besides his own deposition, to substantiate this assertion. Defendant does not dispute that Director Gigliotti consulted with Hendley on how to convene the ABI. Additionally, Hendley was the one who recommended Edward Middleton, a former police chief, to serve on the ABI. (Id.) Furthermore, Defendant does not dispute that Hendley "facilitated the [LETC] where [Plaintiff] used to work and decided to have the videotape reviewed and you know subsequently got the feedback from Mr. Kellogg that it did constitute patient abuse." (Pl.'s Second Resp., Ex. A, Gigliotti Dep. (Doc. 25-2) at 8.) Finally, Plaintiff also points out that, after the ABI rendered its decision, Hendley contacted the Federal Bureau of Investigation to allege civil rights violations against the officer who struck the patient during the use-of-force incident. (Pl.'s Second Resp. (Doc. 25) at 6; Ex. H, Hendley Letter to FBI (Doc. 25-9) at 2.) The parties are in agreement that Hendley committed these actions, but to the extent Plaintiff asserts that Hendley was more involved or had greater influence over the ABI's decision-making process, Plaintiff has not offered proof to support such an inference.

Plaintiff contends that Hendley also played some role in the OSLE inspection, but again, the parties disagree as to the

extent of the role Hendley played.  Plaintiff claims that
Hendley "orchestrated" the inspection. (Compl. (Doc. 1) ¶¶ 31,
42.)  Hendley had conducted a mock inspection, per his duties as
Lead Police Chief, in September 2008.  (Def.'s Initial Summ. J.
Mem., Ex. 41, Mock Inspection Summary (Doc. 8-45) at 1.)  In
that mock inspection, Hendley found deficiencies in five of the
eleven critical areas.  Concerning the official inspection,
Defendant admits that Hendley suggested to Director Gigliotti
that the director ask for an unannounced OSLE inspection in
February 2009, rather than as scheduled in March 2009, and that
Hendley contacted the OSLE on Director Gigliotti's prompting.
(Id., Ex. 2, Apr. 9, 2011 Admin. Hr'g Tr. (Doc. 8-3) at 87, 126,
211.)  Additionally, Plaintiff has offered proof that Dr.
Graves, the OSLE Inspection Team leader, contacted Hendley after
the OSLE inspection, to explain that the OSLE Inspection Team
was planning to recommend that Plaintiff be removed as Police
Chief.  (Id., Ex. 22, Email from Nina Graves to William Dale
Hendley (Doc. 8-23); Pl.'s Second Resp. (Doc. 25) at 7.)  Again,
the parties are in agreement that Hendley committed these
actions, but to the extent Plaintiff asserts that Hendley was
more involved or had greater influence over the OSLE inspection
and the team's report, Plaintiff has not offered proof to
support such an inference.

-12-

Plaintiff does not contend that Director Gigliotti, the members of the ABI, Officer Kellogg at the LETC, or the members of the OSLE Inspection Team acted with racial animus. (See Pl.'s Mem. of Law Pursuant to Rule 56(d) and in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s First Resp.") (Doc. 12-2) at 2; Apr. 19, 2011 Admin. Hr'g Tr. (Doc. 8-3) at 80-81, 86.) Instead, Plaintiff submits circumstantial evidence of only Hendley's alleged racial animus, such as (1) disparaging comments made by Hendley about the performance of two African American Police Chiefs; (2) an off-color joke made by Hendley in an email to Plaintiff about the number of illegal aliens coming to the Durham VAMC; (3) Hendley's lack of help in securing a training officer for the Durham VAMC, even though Hendley helped a white police chief address his department's issues; and (4) Hendley's recommendation of a police chief for the Asheville VAMC who had previously been accused but not found liable of racial discrimination. (Pl.'s Second Resp. (Doc. 25) at 7-9.)

On August 11, 2009, Plaintiff filed a "Complaint of Employment Discrimination" with Defendant in which he alleged that Defendant had discriminated against him based on race and had retaliated against him. (Compl. (Doc. 1) ¶ 40.) The Equal Employment Opportunity hearings were held in front of an Administrative Judge on April 19 and May 19, 2011. (Def.'s

Initial Summ. J. Mem., Ex. 2, Apr. 19, 2011 Admin. Hr'g Tr.

(Doc. 8-3); Ex. 3, May 19, 2011 Admin. Hr'g Tr. (Doc. 8-4).)

The Administrative Judge issued her decision on September 19,

2011, finding that Plaintiff "ha[d] not proved, by a

preponderance of the evidence, that the agency discriminated

against him on the basis of race when the agency suspended him

and subsequently reassigned/demoted him." (Admin. Judge

Decision (Doc. 8-43) at 14.) On October 11, 2011, Plaintiff

received a "Transmittal of Final Agency Decision" from

Defendant's Office of Employment Discrimination Complaint

Adjudication, upholding the Administrative Judge's decision and

denying Plaintiff's complaint.[4] (Agency's Final Order (Doc. 8-

44) at 1.) On January 10, 2012, Plaintiff elected to file suit

in this court, alleging race-based discrimination. (Compl.

(Doc. 1) ¶ 47.)

## II.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate where an examination of the

pleadings, affidavits, and other proper discovery materials

before the court demonstrates that no genuine issue of material

facts exists, thus entitling the moving party to judgment as a

---

[4] Even though the matter has been ruled on by an
Administrative Judge, Plaintiff is nonetheless entitled to a
<u>de novo</u> review of his claims by this court. <u>Chandler v.
Roudebush</u>, 425 U.S. 840, 864 (1976).

matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of initially demonstrating the absence of a genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 323.  If the moving party has met that burden, then the nonmoving party must persuade the court that a genuine issue remains for trial.

> When the moving party has carried its burden under
> Rule 56(c), its opponent must do more than simply show
> that there is some metaphysical doubt as to the
> material facts.  In the language of the Rule, the
> nonmoving party must come forward with "specific facts
> showing that there is a <u>genuine issue for trial</u>."

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (citations and footnote omitted) (<u>quoting</u> Fed. R. Civ. P. 56(e)).  In considering a motion for summary judgment, the court is not to weigh the evidence, but rather must determine whether there is a genuine dispute as to a material issue.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

The court must view the facts in the light most favorable to the nonmovant, drawing inferences favorable to that party if such inferences are reasonable.  <u>Id.</u> at 255.  However, there must be more than a factual dispute; the fact in question must be material, and the dispute must be genuine.  Fed. R. Civ. P. 56(c); <u>Anderson</u>, 477 U.S. at 248.  A dispute is only "genuine"

if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

## III. **ANALYSIS**

Plaintiff's sole claim is that he was disciplined, removed as Police Chief, and reassigned based on his race.[5]  As a federal employee, Plaintiff claims that Defendant violated section 717(a) of the Civil Rights Act, which provides that "[a]ll personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race . . . ."  See 42 U.S.C. § 2000e-16.  "Although phrased differently, section 703(a)(1)," which protects private sector employees, "and section 717(a) have generally been treated as comparable, with the standards governing private-sector illegal claims applied to such claims brought by federal employees." Baqir v. Principi, 434 F.3d 733, 742 (4th Cir. 2006) (citing Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981) (en banc)).

---

[5] Plaintiff's Complaint also alleges that Defendant "retaliated against Plaintiff for complaining about discrimination practiced by the agency," (Compl. (Doc. 1) ¶ 47), but Plaintiff does not provide any factual basis for this allegation or present evidence to indicate that he was removed for retaliatory purposes.  Moreover, Plaintiff withdrew his claim of retaliation or "reprisal" during the administrative proceeding. (Apr. 19, 2011 Admin. Hr'g Tr. (Doc. 8-3) at 7.) For both of these reasons, this court finds that Defendant is entitled to summary judgment on any claim of retaliation made by Plaintiff.

To prove that a genuine dispute exists as to whether an employer engaged in prohibited discrimination, a federal employee may rely on the McDonnell Douglas burden-shifting framework.  See id. (applying burden-shifting framework in the case of a VA doctor claiming race-based discharge).  The first step in the McDonnell Douglas framework is demonstrating a prima facie case of prohibited discrimination.  Here, Plaintiff's prima facie case may be established by showing

> (1) he is a member of a protected class, (2) he
> suffered an adverse employment action (such as
> discharge), (3) he was performing his job duties at a
> level that met the employer's legitimate expectations
> at the time of the adverse employment action, and (4)
> [there were circumstances that give rise to an
> inference of discrimination, such as] his position
> remain[ing] open or [being] filled by a similarly
> qualified applicant outside the protected class.

Id.; Gerner v. Cnty. of Chesterfield, 674 F.3d 264, 266 (4th Cir. 2012).  If Plaintiff can demonstrate a prima facie case, the burden of production then shifts to Defendant to show that there was a legitimate nondiscriminatory reason for the adverse employment action that can neutralize the inference of discrimination.  Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284-85 (4th Cir. 2004).

If Defendant provides a legitimate nondiscriminatory reason, the third step of the McDonnell Douglas framework requires that Plaintiff show that Defendant's legitimate

nondiscriminatory reason was mere pretext.  <u>Reeves v. Sanderson</u>

<u>Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000).  As the Fourth

Circuit has explained,

> While the burden of persuasion on the ultimate issue
> of intentional discrimination remains throughout on
> the claimant, at this stage in the proof analysis his
> "required proof of discriminatory motive has in effect
> been narrowed and focused upon the specific reasons
> advanced by the employer . . . , but the underlying
> requirement remains to prove that the real as opposed
> to now specifically 'articulated' reasons [sic] was a
> racially inspired intent to treat less favorably."

<u>Page</u>, 645 F.2d at 230-31 (quoting <u>Wright v. Nat'l Archives &</u>

<u>Records Serv.</u>, 609 F.2d 702, 716 (4th Cir. 1979)).  Along with

proving pretext, Plaintiff can use the mixed-motive[6] alternative

provided in 42 U.S.C. § 2000e-2(m) to show that Defendant's

legitimate nondiscriminatory reason, "while true, is only one of

the reasons for its conduct, and another 'motivating factor' is

the plaintiff's protected characteristic."  <u>Rishel v. Nationwide</u>

---

[6] Defendant claims that Plaintiff "does not allege that race
was a 'motivating factor'" and "does not present any direct
evidence of intentional race based discrimination," implying
that this court need not examine the mixed-motive theory of
discrimination. (Def.'s Renewed Summ. J. Mem. (Doc. 19) at 2.)
However, this court will not foreclose a mixed-motive argument
based on lack of notice, as Defendant was put on notice of such
a claim in Plaintiff's Complaint.  Additionally, this court will
not foreclose such an argument based on a lack of direct
evidence of discrimination, as the Supreme Court has held that
direct evidence is not required to state a mixed-motive claim.
<u>See</u> <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003).
Therefore, this court will analyze whether Plaintiff has shown
that a genuine dispute exists as to either the pretext argument
or the mixed-motive argument.

Mut. Ins. Co., 297 F. Supp. 2d 854, 865 (M.D.N.C. 2003). If Plaintiff can show a genuine issue of material fact that his removal and reassignment was motivated by an impermissible criterion or that Defendant's proffered reason for removing and reassigning Plaintiff was pretextual, Plaintiff can defeat Defendant's Renewed Motion for Summary Judgment. See id. at 866.

## A.  Prima Facie Case of Race-Based Discrimination

This court must first analyze whether Plaintiff has demonstrated a prima facie case of race-based discrimination. Neither party disputes that Plaintiff was a member of a protected class, nor that he was subject to an adverse employment action.  Instead, the parties dispute whether Plaintiff was meeting Defendant's legitimate expectations and whether there were circumstances that gave rise to an inference of racial discrimination.  Although this court recognizes this is a close question, this court ultimately finds that Plaintiff has demonstrated a prima facie case of discrimination.

The Supreme Court has explained that the burden of establishing a prima facie case for discrimination "is not onerous." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  Instead, the prima facie case is merely to perform the "important function" of "eliminat[ing] the most common

nondiscriminatory reasons" for the adverse employment action. Id. at 253-54.

Here, Plaintiff has alleged that he was performing his work satisfactorily and that the circumstances surrounding his removal lead to an inference of discrimination. (Pl.'s Second Resp. (Doc. 25) at 11-13.) To show satisfactory job performance, Plaintiff points to two performance evaluations from his time as Police Chief, where he was rated as "successful" and "excellent." (Id., Ex. D, Excerpt from Apr. 19, 2011 Admin. Hr'g Tr. (Doc. 25-5) at 4.) Plaintiff also contends that Hendley's excessive participation in the adverse employment action constitutes circumstances that lead to an inference of discrimination. Defendant contends that Plaintiff has not demonstrated a prima facie case, pointing to the findings of the ABI and the OSLE Inspection Team as proof that Defendant was not performing his duties in a satisfactory manner. (Def.'s Reply to Pl.'s Second Resp. to Def.'s Renewed Mot. for Summ. J. (Doc. 27) at 1-2.)

Defendant is correct that the prima facie case is weakened by the unsatisfactory ratings given by the ABI and the OSLE Inspection Team. However, with both his positive performance reviews before the incident and the allegations Plaintiff makes concerning Hendley's interaction with the ABI, the OSLE

Inspection Team, and Director Gigliotti, Plaintiff's argument gives rise to a reasonable inference that he was removed and reassigned based on his race. Moreover, the fact that Defendant has offered a legitimate nondiscriminatory reason for the adverse employment action leads this court to explore Plaintiff's claim further rather than dismissing Plaintiff's claim based on failure to assert a prima facie case.

**B. Legitimate Nondiscriminatory Reason**

Defendant has articulated two reasons why Defendant decided to remove Plaintiff as Police Chief. After reviewing Defendant's explanation, this court finds these reasons to be legitimate and nondiscriminatory, and as a result, Defendant has met its burden of "articulat[ing] some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995).

First, as a basis for the one-day suspension and then ultimately for removing Plaintiff as Police Chief, Defendant cites the bad professional judgment showed by Plaintiff in the aftermath of the use-of-force incident. (See Def.'s Initial Summ. J. Mem., Ex. 27-A, Proposed Suspension (Doc. 8-29) at 1; Ex. 30, Director Gigliotti's Decision on Proposed Suspension

(Doc. 8-34) at 1.)  The ABI and an expert on use-of-force protocols reviewed the incident, found that the officer had used excessive force, and determined that Plaintiff had not disciplined the officer for not following procedures.  This court finds that Plaintiff's unsatisfactory response to the use-of-force incident was a legitimate nondiscriminatory reason for subjecting Plaintiff to discipline.  Moreover, the incident garnered significant media attention, and even if Defendant disciplined Plaintiff to ease this media scrutiny, this justification would also be a legitimate nondiscriminatory reason for suspending Plaintiff.

Second, Defendant explains that it removed Plaintiff as Police Chief based on his unsatisfactory performance on the OSLE inspection that took place in February 2009.  (See id., Ex. 23, Email from Ralph Gigliotti to Dale Hendley (Doc. 8-24) at 1; Ex. 31, Reassignment Mem. (Doc. 8-35) at 1.)  Defendant has presented this court with documentation of the OSLE inspection, and the report indicates that Plaintiff's police force was found to be less than satisfactory in multiple categories. (See OSLE Inspection Report (Doc. 8-26).)  This inspection indicated a "laissez faire" attitude by Plaintiff and his officers that resulted in numerous problems within the police force, culminating ultimately in the police service not being able to

provide a safe and secure environment for VA patients, visitors, and personnel. (Id. at 11.) The results of this report were corroborated by reports of three other departments at Durham VAMC who had lost confidence in the Durham VAMC police department. (See Apr. 19, 2011 Admin. Hr'g Tr. (Doc. 8-3) at 123-24, 211.) These indicators all serve as legitimate nondiscriminatory reasons for Defendant to remove Plaintiff from his role as Police Chief at Durham VAMC.

Therefore, Defendant has met its burden by offering legitimate nondiscriminatory reasons for removing Plaintiff as Police Chief. Therefore, the inference of prohibited discrimination created by the prima facie case "drops out of the picture," and Plaintiff bears the ultimate burden of proving that he has been the victim of intentional discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).

### C. **Establishing Prohibited Racial Discrimination**

Having determined that Defendant has offered legitimate nondiscriminatory reasons for removing and reassigning Plaintiff, the burden of persuasion now rests with Plaintiff to demonstrate that Plaintiff's removal and reassignment were products of prohibited racial discrimination. See Page, 645 F.2d at 230-31. As stated previously, Plaintiff can satisfy this burden by showing that either (1) the legitimate

nondiscriminatory reasons offered by Defendant are pretextual,
or (2) prohibited racial discrimination was a "motivating
factor" in the decision to remove and reassign Plaintiff.  This
court finds that Plaintiff has not shown that a genuine dispute
exists as to either issue.

### i.  Actual Decisionmaker

Before addressing the presence or absence of a genuine
dispute as to whether Plaintiff was discharged based on his
race, this court must determine who was primarily responsible
for the decision to remove and reassign Plaintiff, as this will
determine what evidence this court must consider.  Plaintiff
alleges that Hendley, as Lead Police Chief for the region, was
the actual decisionmaker, that Director Gigliotti merely
rubberstamped the discriminatory decision made by Hendley, and
that this court should consider the actions and statements of
Hendley as circumstantial evidence that race-based
discrimination led to the adverse employment action.

The Fourth Circuit has held that the Title VII
discrimination inquiry is not limited to the "actions or
statements of formal decisionmakers for the employer" because
"[s]uch a construction of [Title VII] would thwart the very
purposes of the acts by allowing employers to insulate
themselves from liability simply by hiding behind the blind

approvals, albeit non-biased, of formal decisionmakers." Hill,
354 F.3d at 290.  However, the Fourth Circuit has declined to
"allow a biased subordinate who has no supervisory or
disciplinary authority and who does not make the final or formal
employment decision" to become a de facto decisionmaker "simply
because he had a substantial influence on the ultimate decision
or because he has played a role, even a significant one, in the
adverse employment decision."  Id. at 291.

    The ultimate question is whether the subordinate was the
one "principally responsible" for, or the "actual decisionmaker"
behind the adverse employment action.  See id. at 288 (citing
Reeves, 530 U.S. at 151).  It is not enough to show that a
subordinate had "substantial influence" or played a
"significant" role in the adverse employment action.  Id.

    As a general matter, this court has some question as to
whether Hendley exercised supervisory or disciplinary authority,
as the Lead Police Chief of the sector.  It is undisputed that
the Lead Police Chief does not have disciplinary authority and
acts merely as a resource or mentor for the police chiefs at
each individual VA medical center.  However, as the Lead Police
Chief, there is a colorable argument that Hendley has some
supervisory authority over Plaintiff.  Based on this supervisory
authority, however slight, this case is not squarely within the

Fourth Circuit's holding in Hill.  As a result, this court must examine the actual process by which Plaintiff was removed and reassigned to determine whether Hendley was the actual decisionmaker in this instance.

The parties do not dispute the process by which Plaintiff was removed as Police Chief.  As explained in greater detail in the statement of facts, Director Gigliotti made the ultimate decision to remove Plaintiff as Police Chief.  Director Gigliotti took into consideration the findings of the ABI, the outside complaints of patient abuse by Durham VAMC police officers, the reports from other departments that they had lost faith in the Durham VAMC police department, and the findings and recommendations of the OSLE Inspection Team in making his decision.  The parties do not dispute that Director Gigliotti based his decision on these factors and found that Plaintiff should be removed as Police Chief.

Even assuming that Hendley had some supervisory authority over Plaintiff, this court does not find that Hendley was principally responsible for, or the actual decisionmaker in, Plaintiff's removal and reassignment, even if Hendley played a significant role in the process of removing Plaintiff as Durham VAMC Police Chief.  Construing facts in the light most favorable to Plaintiff, it appears that Hendley was involved in

Plaintiff's removal and reassignment in several specific ways. First, Director Gigliotti consulted with Hendley to find a police officer to serve on the ABI, to identify an expert at the LETC to review for excessive use of force, and to "facilitate a team from Central Office to come in to review the operational effectiveness of Police Service." (Pl.'s Second Resp., Ex. A, Gigliotti Dep. (Doc. 25-2) at 12-13.) Second, there was at least some communication between Hendley and Dr. Graves, the leader of the OSLE Inspection Team, as Plaintiff has offered evidence of an email sent by Dr. Graves to Hendley indicating that the OSLE Inspection Team planned to suggest removing Plaintiff as Police Chief.

Despite this involvement, this court is not persuaded that Hendley was the actual decisionmaker or principally responsible for the decision in this instance. In the actions alleged by Plaintiff, Hendley served only as a resource to those actually making decisions related to Plaintiff's performance. Although he suggested a former police chief to serve on the ABI for the use-of-force incident, Hendley was not a part of the board who ultimately concluded that Plaintiff incorrectly assessed the use-of-force issue, nor is there any evidence that Hendley contributed or influenced any opinion of the former police chief. Additionally, although he helped schedule the inspection

by the OSLE, Hendley did not participate in the investigation that found Plaintiff's police force failed in a number of categories. Plaintiff has not referred this court to any evidence that shows or reasonably leads to the inference that Hendley influenced the investigations or ultimate decisions of the ABI or the OSLE Inspection Team.

Furthermore, even if Hendley exerted some indirect influence on the ABI or the OSLE Inspection Team, these groups conducted independent, non-biased inquiries and based their recommendations on their findings. The undisputed evidence indicates that the ABI interviewed witnesses, consulted medical professionals, and reviewed the videotape of the incident in making their decision that Plaintiff incorrectly excused another employee's excessive use of force. Similarly, the undisputed evidence shows that the OSLE Inspection Team used the standard procedures in assessing the police force that Plaintiff led. In fact, Plaintiff has conceded that the members of the ABI and the OSLE Inspection Team were unbiased in their action. (Apr. 19, 2011 Admin. Hr'g Tr. (Doc. 8-3) at 80-81, 86; Pl.'s Second Resp. (Doc. 25) at 12.) Hendley may have been involved in coordinating aspects of these reviews of Plaintiff's performance, but the independent, non-biased nature of these

inquiries proves that Hendley was not the actual decisionmaker.
See Hill, 354 F.3d at 295.

More importantly, Director Gigliotti continued to exercise
authority independent of Hendley in determining that Plaintiff
should be removed as Police Chief.  Director Gigliotti held the
formal authority to remove and reassign Plaintiff.[7]  As Director
Gigliotti made the decision, he admits he spoke with Hendley.
However, Director Gigliotti also had the findings and
recommendations of the ABI and the OSLE Inspection Team to
assist him as he made the decision on whether or not to remove
and reassign Plaintiff.  Additionally, Director Gigliotti had
his knowledge of the dysfunction in Plaintiff's department and
had received reports from other department heads about their
dissatisfaction with the police force at Durham VAMC.
Therefore, although Director Gigliotti consulted with Hendley,

---

[7] The evidence in front of this court suggests that Sara S.
Haigh, who became Assistant Director at Durham VAMC on March 1,
2009 and is Caucasian, could be seen as the actual
decisionmaker. Haigh reported that she was the "deciding
official" who removed and reassigned Plaintiff, as she was
"responsible for supervision of Police Service and thus
responsible for signing the memo notifying [Plaintiff] of the
reassignment."  (Def.'s Initial Summ. J. Mem., Ex. 32, Haigh
Aff. (Doc. 8-36) at 2, 5.)  Haigh explains that her decision was
also based on the unsatisfactory performance on the OSLE
inspection.  (Id. at 5.)  Neither party argues that Haigh was
the actual decisionmaker, and based on this court's review of
the evidence, there does not appear to be a genuine dispute that
Haigh, if she was the formal decisionmaker, was influenced by
Hendley.

Plaintiff has not shown that Director Gigliotti merely rubberstamped the decision of Hendley or any other person.  See Schafer v. Md. Dep't of Health & Mental Hygiene, 359 Fed. App'x 385, 389 (4th Cir. 2009) (listing a director's instructions to a committee and the director's power to ultimately confirm the committee's decision as factors supporting a finding that the director was the actual decisionmaker).

Plaintiff cites Staub v. Proctor Hospital, 562 U.S. 411, 131 S. Ct. 1186 (2011), as further guidance on whether Hendley is the actual decisionmaker in this situation.  (See Pl.'s First Resp. (Doc. 12-2) at 3.)  Staub is a case applying the Uniformed Services Employment and Reemployment Rights Act (USERRA), but the Supreme Court recognized that the statute is "very similar to Title VII."  Staub, 131 S. Ct. at 1190-91.  In its holding, the Staub Court indicated that "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA."  Id. at 1194 (footnotes omitted).  On its face, this appears to be a less stringent "decisionmaker" or "cat's-paw" analysis than the one currently applied by the Fourth Circuit under Hill, as it seems to make it

easier for an employer to be held liable for the intentional actions of someone other than the formal decisionmaker.

However, Staub is not controlling in this instance. The holding in Staub was limited to the USERRA, but even if this standard were to govern Plaintiff's Title VII claim, this court finds that Defendant would still not be held liable. First, Plaintiff has not shown that Hendley was motivated by racial animus in helping to organize the ABI or the OSLE inspection. Plaintiff recognizes that he and Hendley disagreed over whether Plaintiff's officer used excessive force (Pl.'s Second Resp. (Doc. 25) at 11), and if anything, the evidence shows that this disagreement motivated Hendley's actions. Second, even if Hendley was motivated by racial animus, Director Gigliotti made his decision based on the results of the ABI and OSLE Inspection Team reports. Even if Hendley provided some support in organizing these investigations, it cannot be said that his actions were the proximate cause of the adverse employment action. See Young v. United Parcel Serv., Inc., 707 F.3d 437, 449 (4th Cir. 2013) (finding Staub "inapposite" to the facts in the case because plaintiff's co-workers neither possessed the authority to make determinations about plaintiff's employment nor sought to influence the actual decisionmaker), cert. granted on other grounds, ___ U.S. ___, 134 S. Ct. 2898 (2014).

In sum, the "shards of evidence" put together by Plaintiff regarding Hendley's involvement in his removal and reassignment are insufficient to support a finding that Hendley "was the actual decisionmaker, or the one principally responsible for [Defendant's] decision." See Hill, 354 F.3d at 297. Even if this court found Hendley's role in the removal and reassignment decision to be "substantial," the Fourth Circuit has made clear that this finding is insufficient to impute Hendley's alleged bias to Defendant. See id. at 290. As a result, this court will not consider the circumstantial evidence that Plaintiff attributes to Hendley in analyzing whether Plaintiff was the victim of prohibited racial discrimination by Defendant.

### ii. **Pretext**

This court now turns to an examination of the nondiscriminatory reasons offered by Defendant. Having reviewed the evidence in the light most favorable to Plaintiff, this court nonetheless finds that there is no genuine dispute as to whether Defendant's explanation of Plaintiff's removal is pretextual.

Plaintiff does not dispute the findings made by the OSLE Inspection Team, and Plaintiff does not claim that the OSLE Inspection Team members were motivated by inappropriate factors. Accordingly, the results of the OSLE inspection are compelling

evidence of the nondiscriminatory nature of Plaintiff's removal, especially considering that the OSLE Inspection Team found multiple areas of deficiencies in the police force. Plaintiff attempts to use the "surprise" nature of the inspection to show that the inspection was mere pretext to mask the discriminatory reasons for Plaintiff's removal. However, the fact that the OSLE inspection was moved from March 2009 to February 2009 does not change the fact that Plaintiff's police force was not performing in a satisfactory manner and it does not prevent the OSLE inspection from serving as a legitimate basis for Director Gigliotti's decision to remove Plaintiff.

In the same way, the thorough investigation conducted by the ABI shows that Defendant's legitimate nondiscriminatory reasons were not pretextual. Plaintiff claims that elements of the ABI review were somehow irregular. For instance, Plaintiff continues to argue that his assessment of the use-of-force incident was correct and that the ABI made an incorrect assessment of the incident, relying in part on a "subject matter expert" who was a former police chief and not an expert on use-of-force continuum. Plaintiff's assessment does have weight, considering he was an instructor at the LETC on permitted uses of force. Nonetheless, Plaintiff does not dispute that the ABI conducted an investigation in which it interviewed ten different

people, including the officers involved in the incident, medical professionals, and Plaintiff, and the ABI based its conclusion on that investigation.  Moreover, Plaintiff does not claim that the ABI acted with discriminatory purposes.  Therefore, there is no genuine dispute as to whether the ABI's investigation was mere pretext to hide Defendant's discriminatory purpose.

More importantly, Plaintiff has not created a genuine dispute as to whether Director Gigliotti, as the actual decisionmaker, merely cited the ABI and OSLE reports as mere pretext to mask his discriminatory purpose.  In fact, Plaintiff has admitted that Director Gigliotti did not act with a discriminatory purpose.  Therefore, there is no genuine dispute as to whether Defendant's legitimate nondiscriminatory reasons were pretextual, and Plaintiff has not defeated Defendant's Renewed Motion for Summary Judgment on pretext grounds.

### iii. **Motivating Factor**

Finally, this court examines whether race was a "motivating factor" in the decision to remove Plaintiff.  This court finds that there is also no genuine dispute as to this issue.

Plaintiff contends that the disagreement between Plaintiff and Hendley concerned whether or not the officer used excessive force during the October 2008 use-of-force incident, with Plaintiff arguing that it was not an excessive use of force and

Hendley telling Plaintiff that he should change his review in order to keep his job. (See Pl.'s Second Resp. (Doc. 25) at 4.) Plaintiff explains:

> It is abundantly clear that Plaintiff and Hendley disagreed with one another with respect to Plaintiff's conclusion, and report of the same to the Director, that his officer's [sic] did not engage in "excessive force". Hendley did not review the witnesses statements, he indicated to Plaintiff that "it didn't matter" Hendley relied solely upon the video evidence. The incident garnered local media attention. The officers were Caucasian and the patient was an elderly African American veteran. Plaintiff reported the incident to the Director and actually investigated the incident by personally interviewing witnesses. The patient had a history of disruptive behavior. The officer was punched in his jaw by the patient, whom Plaintiff discovered, by actually speaking with his doctor's [sic], was impervious to pain.

> . . . .

> . . . Hendley suggested [Plaintiff] "clean up" his report as it was clear to him from the videotape that excessive force was used. He also indicated the same to the FBI in his letter after the ABI was conducted.

> Thus, <u>because Plaintiff vehemently disagreed that his officers violated the law</u>, he refused Hendley's recommendation to change his report despite the warning from Hendley that he may lose his job. It is true that Plaintiff does not believe that the Director, the ABI, Kellogg, nor Graves, were motivated by discriminatory animus. Conversely, he does believe that Hendley is the decision maker who orchestrated his removal as Police Chief because of racial animus, <u>which stemmed from Plaintiff having the audacity to disagree with Hendley and refuse to change his report</u>.

(Id. at 11-12 (emphasis added) (citation omitted).) Plaintiff's explanation provides a clear, non-race-based explanation for terminating Plaintiff - his disagreement with Hendley and other employees of Defendant as to whether the incident constituted an excessive use of force.

As the Fourth Circuit explained in a similar case, "[i]n offering this explanation as to the real reason for the employer's action, the plaintiff has undone his case. He has tried to take a statute aimed at discrete forms of discrimination and turn it into a general whistleblower statute, which of course Title VII is not." Lightner v. City of Wilmington, N.C., 545 F.3d 260, 264 (4th Cir. 2008). Plaintiff has not provided any evidence that Director Gigliotti was motivated by race in making his decision to remove Plaintiff, and to the extent Plaintiff relies on Hendley's actions, Plaintiff's own explanation has shown that, if Hendley was motivated by anything, it was Plaintiff's refusing to change his assessment of the use-of-force incident after Hendley instructed him to do so that motivated Hendley's actions.

As a result, Plaintiff has not identified a genuine dispute as to whether race was a motivating factor in the decision to remove him as Police Chief, and Plaintiff has not defeated

Defendant's Renewed Motion for Summary Judgment on mixed-motive grounds.

Because he has neither shown that Defendant's legitimate nondiscriminatory reason for his removal was pretext nor that race was a motivating factor, this court finds that there is no genuine dispute as to whether he was the victim of racial discrimination.

## IV.  CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Renewed Motion for Summary Judgment (Doc. 18) is **GRANTED** and that this case is **DISMISSED.** A judgment consistent with this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 31st day of March, 2015.

_____
                United States District Judge